**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| VANDIVER ELIZABETH GLENN f/k/a GLENN MORRISON, | : : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. 1:08-CV-2360-RWS |
| v. | : : | |
| SEWELL R. BRUMBY, GLENN RICHARDSON, CASEY CAGLE, ERIC JOHNSON, and ROBYN J. UNDERWOOD, all in their official capacities, | : : : : : : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Plaintiff's Motion for Summary

Judgment against Defendant Sewell R. Brumby [37], Defendants Glenn

Richardson, Casey Cagle, Eric Johnson, and Robyn J. Underwood's Motion for

Summary Judgment [45], Defendants' Motion for Summary Judgment ("All

Defendants' Motion") [46], and Plaintiff's Motion for Order of Dismissal of

Defendants Richardson, Cagle, Johnson, and Underwood with Prejudice and

without Assessment of Costs ("Plaintiffs Motion for Dismissal") [58].

**Background**

I.    <u>Plaintiff's Gender Identity Disorder</u>

Plaintiff Vandiver Elizabeth Glenn was born a biological male.[1]

(Plaintiff's Statement of Material Facts ("PF"), Dkt. No. [37-3] at ¶ 24;

Defendant Sewell Brumby's Response to Plaintiff's Statement of Material Facts

("Response to PF"), Dkt. No. 51 at ¶ 24).  Since puberty, Glenn has had a deep

persistent awareness that she is a woman.[2]  (PF at ¶ 25).  In early 2005, Glenn

was diagnosed with gender identity disorder ("GID").  (<u>Id.</u> at ¶ 26).  GID is a

diagnosis listed in the American Psychiatric Association's Diagnostic and

Statistical Manual of Mental Disorders ("DSM-IV").  (<u>Id.</u> at ¶ 16).  The

diagnostic criteria for GID are: a strong and persistent cross-gender

identification; persistent discomfort with one's sex or sense of

inappropriateness in the gender role of that sex; no concurrent physical intersex

condition; and resulting clinically significant distress or impairment in social,

---

[1] At all times relevant to this case, Plaintiff had male sex organs and a male chromosomal makeup.  (Defendants' Statement of Undisputed Material Facts ("DF"), Dkt. No. [46-3] at ¶¶ 13-14).  Defendant's expert witness, Dr. Chester Schmidt, Jr., has testified that sex is a biological concept and is determined by an individual's genes and chromosomes.  (DF at ¶ 50).

[2] The Court refers to Plaintiff in this Order as she or her out of respect for Plaintiff's self-identification.

2

occupational, or other important areas of functioning.  (Id. at ¶ 17).  The DSM-IV notes that GID can be "distinguished from simple nonconformity to stereo-typical sex role behavior by the extent and pervasiveness of the cross-gender wishes, interests, and activities," and "represents a profound disturbance of the individual's sense of identity with regard to maleness or femaleness." (Defendants' Statement of Undisputed Material Facts ("DF"), Dkt. No. [46-3] at ¶ 47).

The World Professional Association for Transgender Health ("WPATH")[3] recommends a triadic therapeutic protocol for the treatment of GID, which includes: 1) hormone therapy; 2) a real-life experience ("RLE") by living full-time as a member of the new gender; and 3) sex reassignment surgeries.[4]  (Id. at ¶ 23).  Starting in 2005, Glenn began to take steps to

---

[3] WPATH is a professional association for health care providers who treat patients with GID.  (PF at ¶ 21).

[4] Defendant maintains that "there is insufficient evidence that statements of [WPATH] are accepted in the medical community" and therefore are inadmissible. (Response to PF at ¶¶ 21-23).  Plaintiff's expert witness, Dr. Swenson, stated in her expert report ("Swenson Report") that "most medical providers follow the protocols described by [WPATH]."  (Swenson Report, Dkt. No. [37-5], at 1).  Defense counsel addressed this assertion in Dr. Swenson's deposition.  Dr. Swenson stated that she did not directly know that most medical providers follow the WPATH protocols, but that the protocols are extensions of the treatment methodologies that are described in DSM-IV, a product of the American Psychiatric Association ("APA").  (Deposition of Dr. Swenson ("Swenson Depo"), Dkt. No. [41], at 99:4-6, 100:5-9).  Additionally, Dr. Swenson stated that to her knowledge the APA is generally supportive of the WPATH

transition from male to female under the supervision of health care providers.

(Id. at ¶ 31; DF at ¶ 4).  Plaintiff underwent electrolysis to remove facial hair,

began hormone therapy to make her body more feminine and suppress

testosterone, and also began living as a woman outside of the workplace.  (PF at

¶ 32; DF at ¶¶ 3-8).  In April 2006, Plaintiff underwent surgical procedures,

including a brow lift, liposuction, and narrowing of her jaw line in order to

appear more feminine.  (DF at ¶ 11).

In the Spring of 2006, Plaintiff began a therapist-client relationship with

Dr. Erin Swenson, a licensed marriage and family therapist with a Ph.D. in

psychological services.  (Id. at ¶ 27-28).  In 2006, Glenn was also diagnosed by

Dr. Swenson as having GID.[5]  In her expert report she states that in the years

---

protocols.  (Id. at 100:9-11).  Dr. Swenson also asserted that a large number of
medical practitioners she has worked with are supportive of the WPATH protocols
and that conferences and continuing education events she has attended endorse that
approach to treatment.  (Id. at 99:6-13).  Defendants' expert witness, Dr. Chester
Schmidt, was not asked to render an opinion about the appropriate clinical treatment
for GID, but in his deposition testimony he stated that treatment for individuals with
GID could consist of hormone treatments, real-life experience, and surgery.
(Deposition of Dr. Schmidt ("Schmidt Depo"), Dkt. No. [44], at 103:14-17, 99:2-
100:3).  Based upon the record, there is sufficient evidence that statements of WPATH
are accepted in the medical community.

[5] Dr. Swenson also determined that Glenn is a transsexual.  (PF at ¶ 30).  GID
and transsexualism are closely related and are sometimes used as synonyms, with
transsexuals characterized by an intention to undergo medical treatments to align their
bodies with their gender identities.  (Id. at ¶ 20).

leading up to Glenn's therapy for GID, Glenn experienced clinical depression, at times severe enough to put her at risk of suicide. (Swenson Report at 2). Dr. Swenson is of the opinion that if Glenn were unable to secure treatment for GID the depression would reemerge and significantly impair her ability to work or properly function socially. (Id.).

During the course of therapy, Dr. Swenson recommended that it would be appropriate for Glenn to commence the real-life experience by living full-time as a woman. (PF at ¶ 49). Dr. Swenson's report notes that the successful completion of RLE is a prerequisite to sex reassignment surgery. (Swenson Report at 3). Dr. Swenson states that RLE is central to the treatment of individuals with severe GID and requires at least a year of living full time in the preferred gender expression. (Id.). RLE would ideally provide the individual with psychological relief, and Dr. Swenson observed that Glenn's transition to this point has provided her with significant psychological relief. (Id.; PF at ¶ 34). Plaintiff has not, as of yet, undergone sex reassignment surgery. (DF at ¶ 12-13).

II.   Plaintiff's Employment

In October 2005, Plaintiff, then known as Glenn Morrison and presenting as a man, was hired as an editor by the Georgia General Assembly's Office of

Legislative Counsel ("OLC").  (PF at ¶ 1; DF at ¶ 1).  In order to be hired as an editor in the OLC, Glenn had to take a test on grammar, spelling, proofreading, and vocabulary.  (PF at ¶ 2).  She did very well on the test and was recommended for the position by Beth Yinger, the senior editor.  (<u>Id.</u> at ¶ 3).  The OLC is responsible for drafting bills for legislators, code revision, and publication of the Georgia session laws.  (<u>Id.</u> at ¶ 6).  The staff of the OLC, at all times relevant to this action, included approximately eleven attorneys, eight computer terminal operators, five editors, an office manager, an assistant office manager, and an administrative assistant.  (<u>Id.</u> at ¶ 4).  Defendant Sewell Brumby is the head of the OLC and the chief legal counsel for the Georgia legislature.  (<u>Id.</u> at ¶ 5; DF at ¶ 25).  Brumby has worked in the OLC continuously since 1978 and in his current position is responsible for OLC personnel decisions.  (PF at ¶¶ 11-12; DF at ¶ 26).

In 2006, Glenn informed her direct supervisor, Beth Yinger, that she was transgender and was in the process of becoming a woman.  (PF at ¶ 37).  However, during the time that Plaintiff worked at OLC she presented as a man on every day but one.[6]  (DF at ¶ 2; Plaintiff's Response to Defendant Brumby's

---

[6] None of Plaintiff's coworkers at OLC commented on the physical changes that she underwent during her employment there.  (PF at ¶ 33).

AO 72A
(Rev.8/82)

Statement of Facts ("Response to DF"), Dkt. No. [54], at ¶ 2).  On October 31,

2006 (Halloween), Glenn came to work presenting as a woman.   (PF at ¶ 38).

When Brumby saw her, he told her that her appearance was not appropriate and

asked her to leave the office.  (Id. at ¶¶ 39-40).  Brumby deemed her appearance

inappropriate "[b]ecause he was a man dressed as a woman and made up as a

woman."[7]  (Id. at ¶ 41).  Brumby stated that "it's unsettling to think of someone

dressed in women's clothing with male sexual organs inside that clothing," and

that a male in women's clothing is "unnatural." (PF at ¶¶ 43, 45).  Following

this incident, Brumby met with Yinger to discuss Glenn's appearance on

Halloween 2006 and was informed by Yinger that Glenn intended to undergo a

gender transition.  (Id. at ¶ 47;  DF at ¶ 27).  Brumby took no adverse

employment action against Glenn at that time, and in the months following

Halloween 2006, Glenn came to work presenting as a man.  (DF at ¶ 28; PF at ¶

48).

        In the fall of 2007, Glenn informed Yinger that she was ready to proceed

with gender transition and would begin coming to work as a woman and was

---

        [7] Another editor also came to work on Halloween 2006 wearing a rabbit
costume.  (Deposition of Sewell Brumby ("Brumby Depo"), Dkt. No. [39] at 32:5-12).
Brumby thought this attire was also inappropriate, but in a "very different way" from
Glenn's attire.  (Id. at 32:13-23).  The editor in the rabbit suit was not asked to go
home.  (Complaint [1] at ¶ 23).

also changing her legal name.  (Id. at ¶¶ 50-51; DF at ¶ 29).  She gave Yinger

written materials about GID and photographs of herself presenting as a woman.

(Id. at ¶ 52).  Yinger notified Brumby of Plaintiff's intent and provided him

with the written materials and photographs that Glenn had given her.  (Id. at ¶¶

53-54, 60-61).  Brumby read the written materials and stated that they "were

supportive of the proposition that people should be able to change their sex

within the workplace . . . and advocated for that proposition and included what I

guess you might say are talking points about how such a transition might best

be facilitated."  (PF at ¶ 59).  Brumby subsequently informed Yinger that he

was going to fire Glenn because she was transitioning from a man to a woman.

(Id. at ¶ 83).

III.    Plaintiff's Termination

        Brumby believed that Glenn's intent to transition while employed at OLC

could potentially cause adverse consequences.[8]  (DF at ¶ 30).  At the time of the

termination Brumby was aware that gender transition was considered to be a

form of medical treatment for a health condition and that counseling was a

component of the transition.  (PF at ¶¶ 67, 69).  He also understood that gender

---

[8] Plaintiff asserts that Brumby's justifications for firing Glenn were post hoc and not of actual concern to him at the time he terminated Glenn.  (Response to DF at ¶ 30).  Plaintiff's contention will be discussed in greater detail below.

transition entailed assuming the dress and grooming habits of the opposite sex.

(Id. at ¶ 66).   Before terminating Glenn, Brumby conducted legal research to

determine the legality of firing her based upon her gender transition and also

had another OLC attorney, Marie Story, do the same.  (PF at ¶¶ 71-72).  He

concluded that some authority indicated that terminating an employee for

undergoing gender transition was illegal, but some authority indicated that such

firings are permissible.  (PF at ¶¶ 71, 73, 94).

Brumby also contacted a few legislators and employees of OLC to solicit

their opinions on the matter.  He spoke with Glenn Richardson, then Speaker of

the Georgia House of Representatives.  (PF at ¶ 76).  Speaker Richardson told

Brumby that it should be Brumby's decision on how to handle the situation.

(Id. at ¶ 77).  Brumby also spoke with Lieutenant Governor Casey Cagle's

Chief of Staff, Bradley Alexander, who shared the information with Lieutenant

Governor Cagle.  (Id. at ¶¶ 78, 82).   Brumby also asked Story and another

OLC attorney what they and their fellow OLC employees would think about

working with an individual undergoing a gender transition, but neither offered

an opinion.  (Id. at ¶ 74-75).

In their pre-termination conversation, Alexander asked Brumby if Glenn

had any job performance issues or whether she was being let go for "the

transgender reason." (PF at ¶ 80). Brumby responded that the termination was

not performance-based and was because of the gender transition. (<u>Id.</u> at ¶ 81).

Yinger, Glenn's immediate supervisor, found Glenn's work product to be

"about average" and did not think she should be fired. (<u>Id.</u> at ¶¶ 9-10, 84).

On October 16, 2007, Brumby called Glenn to his office. (PF at ¶ 85).

Once Glenn arrived, Brumby asked her if she "had formed a fixed intention to

[become] a woman." (<u>Id.</u> at 86). She answered that she had. Brumby then

informed her that she was being terminated.[9] (<u>Id.</u> at ¶ 87; DF at ¶ 40). Brumby

told Glenn that the reasons for her termination were that Glenn's intended

gender transition was inappropriate, that it would be disruptive,[10] that some

people would view it as a moral issue, and that it would make Glenn's

coworkers uncomfortable. (PF at ¶ 88). Brumby was not concerned about

whether Glenn's presentation as a woman would appear professional. (DF at ¶

41). Further, he stated that some legislators would view the transition as

immoral and unnatural, and might lose confidence in the OLC if he did not fire

_____

[9] During his tenure as head of OLC, Brumby can only recall terminating two
other employees: a computer terminal operator who was incapable of performing her
job duties, and an editor who had both performance and personality issues. (PF at ¶
13).

[10] Brumby thought that Glenn's gender transition would be "an unusual
notorious event" that would be "much discussed and remarked upon." (PF at ¶ 90).

her.[11]  (Id. at ¶ 32; PF at ¶ 95).  Other concerns that Brumby states he had at the time include potential lawsuits resulting from Glenn's restroom usage and that her transition, as it evidenced instability in her life, might cause Glenn to violate the confidentiality of the OLC's work.[12]  (PF at ¶¶ 93, 97-98; DF at ¶ 31, 33).

Brumby stated during the meeting that he would explore any compromises that Glenn might suggest.  (DF at ¶ 44).  Plaintiff contends that such an offer was illusory because Brumby had identified Plaintiff's gender transition as the reason for her termination and therefore Plaintiff did not feel that there was any accommodation she could offer.  (Response to DF at ¶¶ 44-46).  Plaintiff maintains that Brumby did not think Plaintiff could transition and continue to work at OLC.   Brumby stated that "the sheer fact of [Glenn's gender] transition . . . seemed to me impossible to accomplish in our workplace in an appropriate manner.  And since the sheer fact of it seemed impossible to achieve to me, I did not give consideration to how to best facilitate that which I believed to be impossible."  (PF at ¶ 100).

Plaintiff contends that Brumby's reasons for terminating her were either

_____

[11] Brumby also noted that terminating Glenn would cause some legislators to lose confidence in the OLC.  (PF at ¶ 96).

[12] Brumby had no indication that during the time Glenn had worked at OLC she had ever breached the confidentiality of the OLC's work.  (PF at ¶ 99).

AO 72A
(Rev.8/82)

post hoc justifications or lack support in the record.  Brumby has stated that he

was concerned about lawsuits resulting from Plaintiff's restroom usage.  (DF at

¶ 33).  Plaintiff maintains that Brumby never mentioned a concern about her

bathroom use to her or anyone else at or before the time he fired her.

(Plaintiff's Statement of Additional Material Facts ("PAF"), Dkt. No. [53] at ¶

9).  Additionally, the OLC has four single-occupancy unisex bathrooms.  (DF at

34; PF at ¶ 8).  Defendants note, however, that despite the presence of single-

occupancy restrooms in the OLC, Glenn had access to the public multi-person

women's restrooms on the first, second, and third floors of the Georgia Capitol

Building, in which the OLC is located.  (DF at ¶¶ 35, 36).  Defendants also note

that when presenting as a woman, Glenn uses women's restrooms.  (<u>Id.</u> at ¶ 39).

Plaintiff objects that this assertion is misleading because it relies on Plaintiff's

response to an either/or deposition question that did not include the option of a

single-occupancy restroom.  (Response to DF at ¶ 39).

IV.    <u>Plaintiff's Complaint</u>

         Plaintiff filed a Complaint [1] seeking declaratory and injunctive relief

against Brumby, Richardson, Cagle, Eric Johnson,[13] and Robyn J. Underwood,[14] all in their official capacities.  Plaintiff brings the action pursuant to 42 U.S.C. § 1983 for alleged violations of her rights under the Fourteenth Amendment of the U.S. Constitution.  The Complaint asserts that "[o]n information and belief, Brumby consulted with Defendants Richardson, Cagle, and Johnson concerning Glenn's continued employment and a decision jointly was made to terminate her."[15]  (Complaint at ¶ 28).  The Complaint also asserts that Underwood signed the termination notice given to Glenn.  (Id. at ¶ 33).

Plaintiff's first claim for relief is premised upon discrimination on the basis of sex.  The Complaint alleges that by virtue of Plaintiff's sex, Plaintiff is a member of a particular and clearly identifiable group of people.  (Id. at ¶ 35).  Plaintiff contends that she did not conform to Defendants' sex stereotypes regarding males because of her appearance and behavior at the time of her employment with OLC and because of her intended future appearance and

_____

[13] Johnson is the President Pro Tempore of the Georgia Senate. (Complaint at ¶ 9).

[14] Underwood is the Georgia General Assembly's Legislative Fiscal Officer. (Complaint at ¶ 10).

[15] Plaintiff asserts that she has since learned that the decision to fire her was made solely by Brumby.  Plaintiff's Motion for Order of Dismissal of Defendants Richardson, Cagle, Johnson, and Underwood with Prejudice and without Assessment of Costs [58] is currently before the Court.

AO 72A
(Rev.8/82)

behavior and was terminated for this reason.  (Id. at ¶¶ 36, 39).  Plaintiff asserts

that in being discriminated against on the basis of sex, she was denied equal

protection of the laws, was treated differently from other similarly situated

individuals, and her firing bore no substantial relationship to any important

government interest.  (Id. at ¶¶ 38, 40-41).

Plaintiff's second claim for relief alleges a violation of the Fourteenth

Amendment for discrimination based on a medical condition.  Plaintiff alleges

that Defendants' discrimination prevented her from undergoing medically

necessary treatment for her GID and bore no rational relationship to any

legitimate government interest.  (Id. at ¶¶ 45, 48).  Plaintiff seeks permanent

injunctive relief reinstating her to her legislative editor position with the

General Assembly, a declaration that the Defendants' conduct violates the

Fourteenth Amendment, and an award of costs for the action, including

attorneys' fees and expert fees.  (Id. at 11).

## Discussion

I.      **Plaintiff's Motion for Dismissal [58]**

Plaintiff moves pursuant to Federal Rule of Civil Procedure 41(a)(2) to

dismiss this action with prejudice as to Defendants Richardson, Cagle, Johnson,

and Underwood ("the Four Defendants"), with each party to bear his or her own

costs and fees *vis a vis* each other.  (Motion for Dismissal at 1).  Federal Rule of

Civil Procedure 41(a)(2) states in relevant part, "[e]xcept as provided in Rule

41(a)(1),[16] an action may be dismissed at the plaintiff's request only by court

order, on terms that the court considers proper."  Plaintiff's Motion contends:

"While the information available to Plaintiff prior to discovery indicated that

the Four Defendants participated, along with Defendant Brumby, in the decision

to fire Plaintiff, the testimony of all the defendants was that Brumby made the

decision alone."  (Id. at 1-2).  Plaintiff has offered to dismiss the action against

the Four Defendants *with prejudice* and they do not object to the dismissal of

the claims against them.  (Id. at 2; Four Defendants Response to Motion for

Dismissal, Dkt. No. [66] at 2).

Plaintiff and the Four Defendants do, however, disagree as to whether the

parties should bear their own costs.  Plaintiff urges the Court to decide the issue

of costs and fees after the case is resolved between the remaining

parties–Plaintiff and Defendant Brumby.  (Motion for Dismissal at 3).  The

Four Defendants argue that pursuant to Fed. R. Civ. P. 54(d)(1) the Court

---

[16] Federal Rule of Civil Procedure 41(a)(1) allows a plaintiff to dismiss an action without order of the court if the opposing party has not served either an answer or a motion for summary judgment, or all parties who have appeared have signed a stipulation of dismissal.

should allow them, as prevailing parties, to obtain the costs of this action.

However, even if dismissed with prejudice, the Four Defendants cannot be

deemed to be prevailing parties in the present action.  First, the lawsuit was

brought against all five defendants in their official capacity, and a suit against a

state official in his or her official capacity is a suit against that individual's

office and is no different from a suit against the State itself.[17]  Will v. Mich.

Dept. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 25

(1989).  Therefore, the continued presence of Brumby as a Defendant means

that the State of Georgia, the only true defendant, is still a party to the case.

Second, Plaintiff may still obtain all of the relief she sought from the remaining

Defendant, and thus may still be the prevailing party.  See Crowder v. Hous.

Auth. of Atlanta, 908 F.2d 843, 849 (11th Cir. 1990) (plaintiff was prevailing

party because of success on significant issue even though all relief sought was

not obtained).  Furthermore, all Defendants in this action have been jointly

represented so it is unlikely that the representation of their unified interests

resulted in greater costs than representing only Defendant Brumby and the State

of Georgia.  Finally, attorneys' fees are not appropriate pursuant to 42 U.S.C. §

---

[17] Because Plaintiff seeks only prospective injunctive relief, there is no question of Eleventh Amendment immunity in this action.  Ex parte Young, 209 U.S. 123, 159-161, 28 S. Ct. 441, 52 L. Ed. 714 (1908).

AO 72A
(Rev.8/82)

1988 for the Four Defendants because there is no evidence that "the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." Hensley v. Eckerhart, 461 U.S. 424, 429 n.2, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

Therefore, Plaintiff's Motion for Dismissal [58] is **GRANTED**. Defendants Richardson, Cagle, Johnson, and Underwood are **DISMISSED**, **with prejudice**.  Further, the Four Defendants will bear their own costs.

## II.   Defendants Glenn Richardson, Casey Cagle, Eric Johnson, and Robyn J. Underwood's Motion for Summary Judgment [45]

Given the Court's grant of Plaintiff's Motion for Dismissal of Defendants Richardson, Cagle, Johnson, and Underwood, their Motion for Summary Judgment [45] is **DENIED**, **as moot**.

## III.   Remaining Motions for Summary Judgment

In addition to the Motion for Summary Judgment [45] filed by the Four Defendants, all of the Defendants filed a separate Motion for Summary Judgment [46].  The Four Defendants have been dismissed, but the All Defendants' Motion is still before the Court because Defendant Brumby remains a party to this action.  Also pending, is Plaintiff's Motion for Summary Judgment against Defendant Brumby [37].  The Court now addresses these cross-motions for summary judgment.

17

A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome

18

of the suit under the governing law.  Id.  An issue is genuine when the evidence

is such that a reasonable jury could return a verdict for the non-moving party.

Id. at 249-50.

In resolving a motion for summary judgment, the court must view all

evidence and draw all reasonable inferences in the light most favorable to the

non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th

Cir. 2002).  But, the court is bound only to draw those inferences which are

reasonable.  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.

Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted."  Anderson,

477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at

586 (once the moving party has met its burden under Rule 56(c), the

nonmoving party "must do more than simply show there is some metaphysical

doubt as to the material facts").

Finally, the filing of cross-motions for summary judgment does not give

rise to any presumption that no genuine issues of material fact exist.  Rather,

"[c]ross-motions must be considered separately, as each movant bears the

burden of establishing that no genuine issue of material fact exists and that it is

entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser

Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

      B.     Section 1983 and the Equal Protection Clause

Plaintiff's claims are brought under 42 U.S.C. § 1983.[18]  Section 1983 is

a statutory vehicle for addressing the violation of civil rights.  It provides as

follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress . . .

42 U.S.C. § 1983.  In a § 1983 action, a court must determine "whether the

plaintiff has been deprived of a right secured by the Constitution and laws."

---

[18] "[A]n employment discrimination plaintiff alleging the violation of a
constitutional right may bring suit under § 1983 alone, and is not required to plead
concurrently a violation of Title VII [of the Civil Rights Act of 1964, 42 U.S.C. §
2000 *et seq.*]" Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 117-
18 (2d Cir. 2004) (quoting Annis v. Cty. of Westchester, 36 F.3d 251, 255 (2d Cir.
1994).

Baker v. McCollan, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L. Ed. 2d 433 (1979).

Plaintiff's two claims for relief are both based upon alleged violations of the Equal Protection Clause of the Fourteenth Amendment.  Her first claim is for discrimination on the basis of sex, while her second claim is for discrimination on the basis of medical condition.  The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of laws."  U.S. Const. amend. XIV, § 1.  "The central mandate of the equal protection guarantee is that '[t]he sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.'"  Lofton v. Sec'y of Dept. of Children and Family Svcs., 377 F.3d 1275, 1277 (11th Cir. 2004) (quoting Lehr v. Robertson, 463 U.S. 248, 265, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983)).  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  Kicklighter v. Evans County School Dist., 968 F.Supp. 712, 720 (S.D. Ga. 1997) (citing City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439, 105 S. Ct. 3249, 3253-54, 87 L. Ed. 2d 313 (1985)).

An equal protection claim must allege that the plaintiff is a member of an identifiable group, was subjected to differential treatment from others similarly situated, and the difference in treatment was based on his or her membership in that group.  See Pers. Adm'r of Mass v. Feeny, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).  The purpose of this analysis is "[t]o maintain the focus on discrimination and to avoid constitutionalizing every state . . . dispute."  Griffin Indus. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007). Plaintiff is a member of an identifiable group.  For her sex discrimination claims she is a member of an identifiable group based upon her sex and for her second claim, she is a member of an identifiable group based upon her medical condition–GID.  Plaintiff also alleges that she was similarly situated to the other employees of OLC, particularly the other editors,[19] but that she was singled out for termination because of her sex and her medical condition.[20]

In evaluating a claim based upon the Equal Protection Clause, the Supreme Court has applied three different levels of scrutiny, depending upon

---

[19] Yinger, Plaintiff's supervisor, thought her work product was "about average."  (PF at ¶ 10).

[20] It is notable that during his lengthy career at OLC, Brumby can only recall terminating two other employees: a computer terminal operator who was incapable of performing her job duties, and an editor who had both performance and personality issues.  (PF at ¶ 13).

22

the basis of the classification.  Clark v. Jeter, 486 U.S. 456, 461, 108 S. Ct.

1910, 100 L. Ed. 2d. 465.  The Supreme Court noted that at a minimum,

classifications must be rationally related to a legitimate government purpose.

Id.  Intermediate scrutiny is applied to classifications based upon sex or

illegitimacy.  Id.  In order to withstand intermediate scrutiny, the classification

must be substantially related to an important government objective.  Id.  The

most exacting scrutiny is applied to classifications based on race or national

origin and those affecting fundamental rights.  Id.  The Court now turns to the

application of these principles to Plaintiff's claims.

     C.    Plaintiff's Sex Discrimination Claim

     The Supreme Court has recognized that individuals have a right,

protected by the Equal Protection Clause, to be free from discrimination on the

basis of sex in public employment.  Davis v. Passman, 442 U.S. 228, 234-35, 99

S. Ct. 2264, 60 L. Ed. 2d 846 (1979).  To establish a sex discrimination claim, a

plaintiff must prove that he or she suffered purposeful or intentional

discrimination on the basis of sex.  See Village of Arlington Heights v. Metro.

Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)

(proof of intent or purpose is required to show violation of Equal Protection

Clause).  The parties disagree as to whether firing Plaintiff for seeking to come

to work presenting as a woman constitutes discrimination on the basis of sex.

           i.      Sex stereotyping

Plaintiff's claim is based upon sex stereotyping, as recognized by the

Supreme Court in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S. Ct. 1775,

104 L. Ed. 2d 268 (1989).  In that case, Ann Hopkins, a senior manager in one

of Price Waterhouse's offices, sued her employer after her candidacy for

partnership was held for reconsideration and she was later not reproposed for

partnership. <u>Id.</u> at 231-2.  She alleged that Price Waterhouse had discriminated

against her on the basis of sex in its decision regarding partnership. <u>Id.</u> at 232.

Hopkins was denied partnership in the firm, in part, because she was considered

"macho," and "overcompensated for being a woman." <u>Id.</u> at 235.  She was

advised that she could improve her chances of becoming a partner if she would

take "a course at charm school," "walk more femininely, talk more femininely,

dress more femininely, wear make-up, have her hair styled, and wear jewelry."

<u>Id.</u>  Six members of the Supreme Court agreed that such comments were

indicative of gender discrimination, holding that Title VII barred not just

discrimination because of biological sex, but also sex stereotyping–that is

failing to conform to stereotypes associated with one's biological sex. <u>Id.</u> at

250-51 (plurality opinion of four Justices); id. at 258-61 (White, J., concurring); id. at 272-73 (O'Connor, J., concurring).  The Court noted that "[a]s for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotypes associated with their group."  "A number of courts have relied on Price Waterhouse to expressly recognize a Title VII cause of action for discrimination based on an employee's failure to conform to stereotypical gender norms."  Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1223 (10th Cir. 2007).[21]

---

[21] The Tenth Circuit cited the following cases:
See, e.g., Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 262-64 (3d Cir. 2001); Nichols v. Azteca Rest. Enters., 256 F.3d 864, 874-75 (9th Cir. 2001); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 n. 4 (1st Cir. 1999); Doe by Doe v. City of Belleville, 119 F.3d 563, 580-81 (7th Cir. 1997), vacated on other grounds, 523 U.S. 1001, 118 S.Ct. 1183, 140 L. Ed. 2d 313 (1998). . . . . Barnes v. City of Cincinnati, 401 F.3d 729, 737 (6th Cir. 2005) . . . . cf. Rosa v. Park W. Bank & Trust Co., 214 F.3d 213, 215-16 (1st Cir. 2000) (concluding a transsexual could state a claim for sex discrimination under Equal Credit Opportunity Act by analogizing to Title VII); Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (relying on Title VII case law to conclude that violence against a transsexual was violence because of gender under the Gender Motivated Violence Act).
Etsitty, 502 F.3d at 1223-24.  See also Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 ("stereotyping of women as caregivers can by itself and without more be evidence of an impermissible, sex-based motive").

This action is not the first in which an individual with GID has relied

upon the sex-stereotyping theory of Price Waterhouse to assert a claim resulting

from an adverse employment action.  Several courts have recognized that a

transsexual who alleges that he or she was subject to an adverse employment

action for failing to conform to sex stereotypes concerning how an individual of

that biological sex should look and behave have sufficiently plead claims of sex

stereotyping and gender discrimination.  See Smith v. City of Salem, Ohio, 378

F.3d 566, 572, 575 (6th Cir. 2004) ("Sex stereotyping based upon a person's

gender non-conforming behavior is impermissible discrimination, irrespective

of the cause of that behavior . . ."); Kastl v. Maricopa Co. Cmty. Coll. Dist., 325

Fed. Appx. 492, 493 (9th Cir. 2009) ("it is unlawful to discriminate against a

transgender (or any other) person because he or she does not behave in

accordance with an employer's expectations for men or women . . . . Thus,

[plaintiff] states a prima facie case of gender discrimination . . ."); Creed v.

Family Express Corp., No. 3:06-CV-465RM, 2009 WL 35237 (N.D. Ind. Jan. 5,

2009) (transgender plaintiff "may succeed on her sex stereotyping claim if she

can present sufficient evidence from which a rational jury could infer

intentional discrimination"); Schroer v. Billington, 577 F. Supp. 2d 293, 308

(D.D.C. 2008) ("In refusing to hire [plaintiff] because her appearance and

26

background did not comport with the decisionmaker's sex stereotypes about how men and women should act and appear . . . [defendant] violated Title VII's prohibition on sex discrimination."); <u>Lopez v. River Oaks Imaging & Diagnostic Group, Inc.</u>, 542 F. Supp. 2d 653, 667-68 (S.D. Tex. 2008) (plaintiff, a transsexual male, "has stated a legally viable claim of discrimination as a male who failed to conform with traditional male stereotypes").  The Tenth Circuit assumed, without deciding, that such a claim is available, but determined that Plaintiff could not demonstrate that the stated reason for her termination was pretext.  <u>Etsitty</u>, 502 F.3d at 1224.

   In contrast, the court in <u>Oiler</u> explicitly rejected the theory that a transsexual can bring an employment discrimination claim based upon sex stereotyping resulting from their presentation as a member of the opposite sex. <u>Oiler v. Winn-Dixie La., Inc.</u>, No. Civ. A. 00-3114, 2002 WL 31098541 (E.D. La. Sept. 16, 2002).[22]  In reaching this conclusion, the court in <u>Oiler</u> relied upon

---

[22] The district court decision in <u>Etsitty</u> does support the rationale of <u>Oiler</u>. <u>Etsitty v. Utah Transit Auth.</u>, No. 2:04CV616 DS, 2005 WL 1505610, at *3-4. However, the Tenth Circuit rejected the notion that transsexuals are excluded from Title VII protections: "The conclusion that transsexuals are not protected under Title VII as transsexuals should not be read to allow employers to deny transsexual employees the legal protection other employees enjoy merely by labeling them as transsexuals."  <u>Etsitty</u>, 502 F.3d at 1222 n.2.
   Also, the court in <u>Lopez</u>, another district court within the Fifth Circuit, explicitly rejected the conclusion of the court in <u>Oiler</u>, that transgendered individuals

a pre-<u>Price Waterhouse</u> Seventh Circuit case,[23] and a series of similar cases that

stand for the proposition that individuals discharged because they are

transsexuals do not have cognizable claims under Title VII for sex

discrimination.[24]  <u>Oiler</u>, 2002 WL 31098541 at *3-4, *4 n.51.  This Court has

also previously held that transsexuals are not a suspect classification.  <u>Rush v.

Johnson</u>, 565 F. Supp. 856, 868 (N.D. Ga. 1983).  The line of cases relied upon

by the court in <u>Oiler</u> and this Court in <u>Rush</u> were addressed by the Sixth Circuit

in its decision in <u>Smith</u>.

        The Sixth Circuit noted that, "the approach in <u>Holloway</u>, <u>Sommers</u>, and

<u>Ulane</u> . . . has been eviscerated by <u>Price Waterhouse</u>."[25]  <u>Smith</u>, 378 F.3d at 573

(citing <u>Schwenk</u>, 204 F.3d at 1201 ("The initial judicial approach taken in cases

such as <u>Holloway</u> has been overruled by the logic and language of <u>Price</u>

_____

are not entitled to protection under Title VII via application of <u>Price Waterhouse</u>.  542
F. Supp. 2d at 659 n.10.  The Fifth Circuit has not addressed the issue.

        [23] <u>Ulane v. Eastern Airlines, Inc.</u>, 742 F.2d 1081 (7thCir. 1984), <u>cert.</u> <u>denied</u>,
471 U.S. 1017, 105 S. Ct. 2023, 85 L. Ed. 2d 304 (1985).

        [24] <u>Oiler</u>, 2002 WL 31098541 was decided before <u>Kastl</u>, 325 Fed. Appx. 492
(2009), <u>Etsitty</u>, 502 F.3d 1215 (2007), <u>Smith</u>, 378 F.3d 566 (2004), <u>Creed</u>, 2009 WL
35237 (2009), <u>Schroer</u>, 577 F. Supp. 2d 293 (2008), and <u>Lopez</u>, 542 F. Supp. 2d 653
(2008).

        [25] <u>Holloway v. Arthur Anderson & Co.</u>, 566 F.2d 659 (9th Cir. 1977); <u>Sommers
v. Budget Marketing Inc.</u>, 667 F.2d 748 (8th Cir. 1982); <u>Ulane</u>, 742 F.2d 1081.

Waterhouse.")); see also Kastl, 325 Fed. Appx. at 493 (stating that post Price

Waterhouse and Schwenk it is unlawful to discriminate against a transgender

for failing to behave in accordance with an employer's expectations for men or

women).  The Sixth Circuit noted that this earlier jurisprudence denied

transsexuals Title VII protection because they were considered victims of

"gender" rather than "sex" discrimination.  Smith, 378 F.3d at 573.  However,

the Supreme Court in Price Waterhouse "established that Title VII's reference

to 'sex' encompasses both the biological differences between men and women,

and gender discrimination, that is, discrimination based on a failure to conform

to stereotypical gender norms."[26]  Id.

---

[26] The Oiler court also relied on what Congress intended by its use of the word "sex" in Title VII.  2002 WL 31098541 at *4.  However, in addressing Congressional intent in using the term "sex," the Oiler court neglected to address the Supreme Court's holding in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).  Justice Scalia, writing for a unanimous Court, stated that it was improper to exclude same-sex sexual harassment from the scope of Title VII based on a notion that Congress was not seeking to address that "evil."  Id. at 79. The Court noted that:

> statutory prohibitions often go beyond the principal evil to cover
> reasonably comparable evils, and it is ultimately the provisions of our
> laws rather than the principal concerns of our legislators by which we
> are governed. Title VII prohibits "discriminat [ion] . . . because of . . .
> sex" in the "terms" or "conditions" of employment. Our holding that this
> includes sexual harassment must extend to sexual harassment of any
> kind that meets the statutory requirements.

Id. at 79-80.

This Court concurs with the majority of courts that have addressed this issue, finding that discrimination against a transgendered individual because of their failure to conform to gender stereotypes constitutes discrimination on the basis of sex.  The two circuits that have definitively addressed this question have reached the same conclusion.[27]  See Kastl, 325 Fed. Appx. at 493; Smith, 378 F.3d at 572, 575.  This conclusion is not at odds with this Court's earlier decision in Rush that transsexuals are not a suspect class,[28] and is the result of the logical application of the Supreme Court's reasoning in Price Waterhouse.[29] While transsexuals are not members of a protected class based on sex, those

---

[27] Further, a third circuit, assumed that this was an appropriate theory of sex discrimination, but did not definitively reach this conclusion.  Etsitty, 502 F.3d at 1224.

[28] Rush did not consider the issue of whether transsexuals can allege sex discrimination.  Rush alleged that Georgia, in denying Medicaid coverage for certain procedures, was "invidiously discriminating between transsexuals who require inpatient hospital services and physicians' services for such condition, and others who require such services for other conditions."  Rush, 565 F. Supp. at 868.  Rush was based on a government classification between transsexuals and non-transsexuals.  There was no allegation of discrimination based on sex or sex stereotyping in Rush.  Id.

[29] See Lopez, 542 F. Supp. 2d at 660 ("The Court cannot ignore the plain language of Title VII and Price Waterhouse, which do not make any distinction between a transgendered litigant who fails to conform to traditional gender stereotypes and an "effeminate" male or "macho" female who, while not necessarily believing himself or herself to be of the opposite gender, nonetheless is perceived by others to be in nonconformity with traditional gender stereotypes. There is nothing in existing case law setting a point at which a man becomes too effeminate, or a woman becomes too masculine, to warrant protection under Title VII and Price Waterhouse.").

AO 72A
(Rev.8/82)

who do not conform to gender stereotypes are members of a protected class

based on sex.  See Price Waterhouse, 490 U.S. at 251 (stating "we are beyond

the day when an employer could evaluate employees by assuming or insisting

that they matched the stereotype associated with their group").  In reaching the

same conclusion as this Court does today, the Sixth Circuit noted that some

courts improperly "superimpose classifications such as 'transsexual' on a

plaintiff, and then legitimize discrimination based on plaintiff's gender non-

conformity by formalizing the non-conformity into an ostensibly unprotected

classification."  Smith, 378 F.3d at 577; see also Lopez, 542 F. Supp. 2d at 653

("[T]ranssexuality is not a bar to [a] sex stereotyping claim.  Title VII is

violated when an employer discriminates against any employee, transsexual or

not, because he or she has failed to act or appear sufficiently masculine or

feminine enough for an employer.").  While Plaintiff has successfully asserted a

claim based on sex, she must still demonstrate that Brumby's actions fail to

survive the appropriate level of scrutiny.

    ii.  The merits of Plaintiff's sex discrimination claim.

   To effectively make out an equal protection claim, Plaintiff must prove

that she suffered purposeful or intentional discrimination on the basis of

gender.[30]  See Vill. Of Arlington Heights, 429 U.S. at 264-65.  Discrimination

based on gender, once proven, can only be tolerated if the state "demonstrate[s]

an 'exceedingly persuasive justification' for that action."  United States v.

Virginia, 518 U.S. 515, 524, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996).

The overarching framework for this Court's analysis of Plaintiff's claim

is the familiar one articulated by the Supreme Court in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See

Richardson v. Leeds Police Dep't, 71 F.3d 801, 806 (11th Cir. 1995) ("In a case

such as this alleging disparate treatment, in which § 1983 is employed as a

remedy for the same conduct attacked under Title VII, the elements of the two

causes of action are the same.  In both instances, the plaintiff must prove that

the defendant acted with discriminatory intent.") (internal quotations omitted);

see also Lockridge v. Bd. of Trustees of Univ. of Ark., 315 F.3d 1005, 1009-10

(8th Cir. 2003) (employing McDonnell Douglas framework to analyze disparate

treatment claims brought pursuant to § 1981 and the Equal Protection Clause);

English v. Colo. Dep't of Corr., 248 F.3d 1002, 1007 (10th Cir. 2001) ("'While

---

[30] The Supreme Court in Price Waterhouse explained that "[i]n saying gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee is a woman." 490 U.S. at 250.

McDonnell Douglas involved a Title VII claim for failure to hire, the analytical

framework it pioneered applies equally to claims brought pursuant to section

1981,' as well as to § 1983 claims based on allegations of racial discrimination

in violation of the Equal Protection Clause of the Fourteenth Amendment ."

(citations omitted)).  As the Eleventh Circuit has explained:

> Under the McDonnell Douglas framework, a plaintiff first must
> show an inference of discriminatory intent, and thus carries the
> initial burden of establishing a prima facie case of discrimination.
> The plaintiff's successful assertion of a prima facie case "creates a
> rebuttable presumption that the employer unlawfully discriminated
> against her." Second, if the plaintiff successfully demonstrates a
> prima facie case, the burden then shifts to the employer to produce
> evidence that its action was taken for a legitimate,
> non-discriminatory reason.  We proceed to the third step of the
> analysis once the employer meets its burden of production by
> proffering a legitimate, non-discriminatory reason, thereby
> rebutting the presumption of discrimination, and "[our] inquiry
> 'proceeds to a new level of specificity,' in which the plaintiff must
> show that the proffered reason really is a pretext for unlawful
> discrimination."  "Although the intermediate burdens of production
> shift back and forth, the ultimate burden of persuading the trier of
> fact that the employer intentionally discriminated against the
> employee remains at all times with the plaintiff.

Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1162

(11th Cir. 2006).

The Plaintiff has established a prima facie case of discrimination by

showing an inference of discriminatory intent in her termination.  In Smith,

defendants sought to use the manifestations of plaintiff's transsexualism as a basis for terminating his employment.  378 F.3d at 568.  The Sixth Circuit found that plaintiff had sufficiently plead claims of gender discrimination.  <u>Id.</u> at 572.  In <u>Kastl</u>, the Ninth Circuit found that plaintiff had stated a prima facie case of gender discrimination by alleging that impermissible gender stereotypes were a motivating factor in defendant's actions.  325 Fed. Appx. at 493.[31]  In <u>Lopez</u>, the court found that the plaintiff had sufficiently shown a prima facie case of discrimination by alleging that her job was revoked because of animus towards an individual who "presented herself in a manner inconsistent with hiring managers' preconceived notions of what a male should look and act like."  542 F. Supp. 2d at 662, 665.  Plaintiff's allegations are similar to those of the plaintiffs in these cases.

Plaintiff asserts that "[i]t is an undisputed fact that Brumby fired [her] not because of her work performance but because of her intention to begin presenting herself as a woman in the workplace."  (Memo in Support of Plaintiff's Motion for Summary Judgment, Dkt. No. [37-2] at 12).  Brumby told Glenn that her termination was not performance-based, but was a result of her

---

[31] However, the court rejected the plaintiff's claim because she could not satisfy her burden at the third stage of the <u>McDonnell Douglas</u> analysis.  <u>Kastl</u>, 325 Fed. Appx. at 494.

gender transition.  (PF at ¶ 81).  Brumby stated in his deposition that the

thought of someone with male sexual organs in women's clothing was

"unsettling" to him, was "something I don't like to think about," and was

something he viewed as "unnatural."  (PF at ¶ 43-45).  Furthermore, he only

fired Plaintiff after first confirming that she had reached a fixed decision to

present as a woman in the workplace.  (PF at ¶¶ 86-87).  Defendant argues that

Plaintiff was terminated for undergoing a gender transition, not for a failure to

conform to stereotypes of how a male should look or behave. (Def.'s Response

to Pl.'s Motion for Summary Judgment at 3).  First, Brumby has failed to

identify any concerns that existed at the time of Plaintiff's termination not

related to her intention to come to work as a woman.  Second, in his Response

to Plaintiff's Motion for Summary Judgment [46], Defendant appears to

concede that Plaintiff's appearance was at least in part, a motivating factor

behind her termination.[32]  This evidence is more than sufficient to establish a

---

[32] Defendant states: "The issue was not *merely* one of Plaintiff wearing jewelry, make-up or a wig to have a feminine appearance."  (Def.'s Response to Plaintiff's Motion for Summary Judgment at 3 (emphasis added)).  Defendant also states: "Plaintiff cannot divorce her intended feminine appearance, as *if that were the only issue*, from her stated intention to completely transition from male to female."  (Id. (emphasis added)).  Defendant appears to concede that Plaintiff's "intended feminine appearance" was at least "one issue" contributing to her termination.  Therefore, Defendant in effect concedes that gender was a motivating role in his termination of Plaintiff, because part of the reason that she was terminated was her lack of

prima facie case of discriminatory intent.[33]   Plaintiff's desire to present as a

woman at work did not comport with Brumby's stereotype of how a biological

male should dress or behave.  The burden now shifts to Brumby to produce

evidence that his action was taken for a legitimate, nondiscriminatory reason.

Plaintiff having shown a prima facie case of discrimination, Defendant

must "demonstrate an 'exceedingly persuasive justification'" for her

termination.  Virginia, 518 U.S. at 524.  Defendant may only satisfy the burden

of intermediate scrutiny by "showing at least that the classification serves

'important governmental objectives and that the discriminatory means

employed' are 'substantially related to the achievement of those objectives.'"

Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S. Ct. 3331, 73 L.

Ed. 2d. 1090 (1982) (citation omitted).  Yet Defendant in its briefing does not

even argue in the alternative that its actions survive intermediate scrutiny.

Defendant based his entire defense on the argument that Plaintiff was not a

member of a protected class and therefore his actions must only survive the

_____

conformance to stereotypes he had about how males should dress and act.  See Price
Waterhouse, 490 U.S. at 250.

[33] Several cases have found that a statement of discriminatory intent by a
decisionmaker constitutes direct evidence of discrimination.  See e.g., Bass v. Bd. of
County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1112 (11th Cir. 2001);
Hampton v. City of S. Miami, 186 Fed. Appx. 967, 970 n.3 (11th Cir. 2006).

rational relationship test.  (Def.'s Memo in Support of Motion for Summary

Judgment, Dkt. No. [46-3] at 9; Def.'s Response to Motion for Summary

Judgment, Dkt. No. [50] at 2).  However, as discussed in Section III.C.i.,

Plaintiff has successfully asserted a claim for discrimination on the basis of sex,

and sex is a suspect class entitled to intermediate scrutiny review.  Defendant

has failed to argue that its actions meet the appropriate standard.  Nonetheless,

because this action is currently before the Court on cross-motions for summary

judgment, the Court will explore whether any of Defendants asserted reasons

for terminating Plaintiff are substantially related to an important government

interest.

Defendant asserts that one legitimate government purpose is the

avoidance of lawsuits against the government.  Defendant argues that Plaintiff's

continued employment at OLC while presenting as a woman without

undergoing genital reassignment surgery, could expose the government to suits

for invasion of privacy or sexual harassment.  Defendant argues that although

there were single-occupancy restrooms available in the OLC office, Plaintiff

was not required to use these and may have used the multi-person restrooms

located elsewhere in the Georgia Capitol Building.  (Def.'s Memo in Support of

Motion for Summary Judgment, Dkt. No. [46-3] at 20).  When applying

37

heightened scrutiny to sex discrimination claims, the government's

"exceedingly persuasive" justification for gender classifications "must be

genuine, not hypothesized or invented *post hoc* in response to litigation."

Virginia, 518 U.S. at 533.  Additionally, "a tenable justification must describe

actual state purposes, not rationalizations for actions in fact differently

grounded."  Id. at 535-36.  Brumby has not drawn the Court's attention to any

evidence that he was concerned with Plaintiff's restroom usage, or discussed

Plaintiff's restroom usage with her or anyone else before her termination.

Therefore, since there is no evidence that this was an actual concern of Brumby

in terminating Plaintiff, this asserted reason cannot survive the heightened

scrutiny applicable to Plaintiff's sex discrimination claim.

    The facts of this case are distinguishable from those present in Etsitty and

Kastl.  In Etsitty, the plaintiff, a bus driver for the transit authority and a

biological male, was using female restrooms while on her bus route.  502 F.3d

at 1219.  Her supervisors expressed concern that the transit authority could

incur liability if an employee with male genitalia was observed using a female

restroom.  Id.  The transit authority felt that it was unable to accommodate

plaintiff's restroom needs because she typically used restrooms along her routes

rather than those at the transit authority facility.  Id.  The plaintiff was told that

AO 72A
(Rev.8/82)

her termination "was based solely on her intent to use women's public restrooms while wearing a UTA uniform . . ." Id. at 1224.  The Tenth Circuit found this to be a legitimate, nondiscriminatory reason for the plaintiff's termination under Title VII. Id.  While the Tenth Circuit assumed that the plaintiff had shown a prima facie case of discrimination, it found that plaintiff did not present any evidence that the defendant's asserted rationale for the termination was pretext for discrimination.  Id. at 1226.  Similarly, in Kastl, the defendant had received complaints that a man was using the women's restroom and terminated the plaintiff for safety reasons.  325 Fed. Appx. at 493, 494. The Sixth Circuit found that the plaintiff had failed to satisfy the third prong of the McDonnell Douglas analysis because she could not show that the defendant's rationale for her termination was merely pretext.

In the present action, there is no evidence that Brumby was concerned about Plaintiff's restroom usage before he terminated her.  This fact alone is enough to dismiss this asserted reason as a substantial government interest sufficient to withstand intermediate scrutiny.  See Virginia, 518 U.S. at 533 (stating government's "exceedingly persuasive" justification for gender classifications "must be genuine, not hypothesized or invented *post hoc* in response to litigation").  Additionally, however, there is no evidence that

Plaintiff ever used the female restrooms located within the Capitol Building

while presenting as a woman, or ever intended to.[34]   There is also no evidence

of any complaints concerning Plaintiff's restroom use.  The facts of this action

are more akin to the facts of <u>Lopez</u>, than either <u>Etsitty</u> or <u>Kastl</u>.  The court in

<u>Lopez</u> noted that there was no evidence that the plaintiff's bathroom use was a

concern that motivated the defendant's decision to rescind the job offer.  542 F.

Supp. 2d. at 664 n.15.  As is the case with the OLC office, the defendant in

<u>Lopez</u> admitted "that the facility in which Lopez would have worked was

equipped with a unisex restroom that she could have used with 'absolute

privacy.'"  <u>Id.</u>  Brumby's asserted concern over Plaintiff's restroom usage does

not survive intermediate scrutiny.[35]

---

[34] The record indicates that Plaintiff only presented as a woman at the OLC on
one occasion and was sent home that day.  (PF at ¶ 38-40).  Defendant points to
Plaintiff's deposition response that while presenting as a woman she uses women's
restrooms.  (DF at ¶ 39).  However, Plaintiff was responding to an either/or question
that did not reference single-occupant bathrooms, such as those located in the OLC
office.  (Response to DF at ¶ 39).

[35] The Tenth Circuit in <u>Etsitty</u> stated: "However far <u>Price Waterhouse</u> reaches,
this court cannot conclude it requires employers to allow biological males to use
women's restrooms.  Use of a restroom designated for the opposite sex does not
constitute a mere failure to conform to sex stereotypes."  502 F.3d 1215, 1219.
Likewise, this Court does not conclude that <u>Price Waterhouse</u> requires employers to
allow individuals with male genitalia to use women's restrooms.  However, that is not
the situation presented by the facts of this case.  The evidence demonstrates that the
OLC contained four private bathrooms.  There is also a complete lack of evidence that
Plaintiff's restroom usage was of any concern to Brumby when he decided to

Avoiding lawsuits resulting from Plaintiff's restroom usage was the only

government interest identified by Defendant in his response to Plaintiff's

Motion for Summary Judgment [37].  Defendant did briefly identify two other

concerns in his own Motion for Summary Judgment [46], stating, in totality:

> In addition [to concerns resulting from Plaintiff's restroom use], Sewell Brumby's concern regarding the operation of the Office of Legislative Counsel and the Office having the confidence of the legislators of the State of Georgia, the Defendants have presented several conceivable sets of facts that serve as a rational basis for Plaintiff's termination.

(Def.'s Motion for Summary Judgment at 22).  However, neither concerns

regarding the operation of the OLC nor concerns about preserving the

confidence of state legislators presents an "exceedingly persuasive justification"

for Plaintiff's termination.  The record in this case does not indicate that

Plaintiff's transition would have affected the operation of the OLC.  Plaintiff's

immediate supervisor did not believe that she should be fired. (PF at ¶ 10).

Further, when Brumby asked two OLC attorneys what they thought of working

with an individual who was undergoing a gender transition, neither expressed

concerns.  (Id. at ¶¶ 74-75).  In regards to Georgia legislators, the record

indicates that Brumby communicated his intent to fire Plaintiff to the Speaker of

---

terminate her, and thus that reasoning cannot survive intermediate scrutiny.

AO 72A
(Rev.8/82)

the Georgia House of Representative, the Lieutenant Governor, and the

President Pro Tempore of the State Senate, and the record does not indicate that

any of the three expressed concern that their confidence in the OLC would

diminish if Plaintiff remained employed.  To the extent that the record contains

any evidence that legislators would lose "confidence" in the OLC, it is in the

form of Brumby's statement that some legislators would believe that Glenn's

gender transition was immoral, unnatural, and "ultraliberal."  (PF at ¶ 95).

Even if this were the case, avoiding the anticipated negative reactions of others

cannot serve as a sufficient basis for discrimination and does not constitute an

important government interest.  See Palmore v. Sidoti, 466 U.S. 429, 433, 104

S. Ct. 1879, 80 L. Ed. 2d 421 ("The Constitution cannot control such prejudices

but neither can it tolerate them. Private biases may be outside the reach of the

law, but the law cannot, directly or indirectly, give them effect. 'Public officials

sworn to uphold the Constitution may not avoid a constitutional duty by bowing

to the hypothetical effects of private racial prejudice that they assume to be both

widely and deeply held.'" (quoting Palmer v. Thompson, 403 U.S. 217,

260-261, 91 S. Ct. 1940, 1962-1963, 29 L. Ed. 2d 438 (1971) (White, J.,

dissenting)); City of Cleburne, Tex. v Cleburne Living Ctr., 473 U.S. 432, 448,

105 S. Ct. 3249, 87 L. Ed. 2d 313 ("But mere negative attitudes, or fear,

AO 72A
(Rev.8/82)

unsubstantiated by factors which are properly cognizable in a zoning

proceeding, are not permissible bases for treating a home for the mentally

retarded differently . . . . It is plain that the electorate as a whole, whether by

referendum or otherwise, could not order city action violative of the Equal

Protection Clause . . . and the City may not avoid the strictures of that Clause by

deferring to the wishes or objections of some fraction of the body politic."

(internal citation omitted)).

        As noted, Plaintiff has properly stated a violation of the Equal Protection

Clause based upon sex stereotyping.  Such a claim is subject to intermediate

scrutiny review.  The record demonstrates that Plaintiff's desire to come to

work dressed as a woman did not comport with how Defendant Brumby

believed a biological male should act and that served as a basis for her

termination.  The record also indicated that Brumby was concerned about

negative reactions from others, including state legislators, if he allowed Plaintiff

to do so.  Neither is an "exceedingly persuasive justification," and neither

explanation is sufficient to survive intermediate scrutiny review.  See Hogan,

458 U.S. at 724.   Therefore, Plaintiff is entitled to summary judgment for her

claim of discrimination based on sex.  Plaintiff's Motion for Summary

AO 72A
(Rev.8/82)

Judgment [46] is **GRANTED** as to her First Claim for Relief, and Defendants'

Motion for Summary Judgement as to that claim is **DENIED**.

      D.     <u>Plaintiff's Medical Condition Discrimination Claim</u>

Plaintiff asserts that Brumby discriminated against her as a result of her

GID and that her resulting termination prevented her from undergoing the

prescribed treatment protocol for GID, which includes the real life experience

of presenting as a member of the opposite sex.  It is well established that the

Equal Protection Clause protects individuals with disability and illness

(physical and mental) from discrimination by the states and that laws

classifying individuals on such a basis must meet rational basis scrutiny.

<u>See</u> <u>City of Cleburne</u>, 473 U.S. at 446 ("To withstand equal protection review,

legislation that distinguishes between the mentally retarded and others must be

rationally related to a legitimate governmental purpose."); <u>see</u> <u>also</u> <u>Rivera v.</u>

<u>Allin</u>, 144 F.3d 719, 727 (11thCir. 1998) ("[I]f a law neither burdens a

fundamental right nor targets a suspect class, it does not violate the Fourteenth

Amendment's Equal Protection Clause . . . so long as it bears a rational relation

to some legitimate end." (citation omitted)).  The Eleventh Circuit has stated

that the rational basis test is applied in two steps:

AO 72A
(Rev.8/82)

The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose-a goal-which the enacting government body *could* have been pursuing. The *actual* motivations of the enacting governmental body are entirely irrelevant . . . . The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body. As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

Joel v. City of Orlando, 232 F.3d 1353, 1358 (11th Cir. 2000) (quoting Haves v. City of Miami, 52 F.3d 918, 921-22 (11th Cir. 1995).  Under this standard:

The government has no obligation to produce evidence to support the rationality of its statutory classifications and may rely entirely on rational speculation unsupported by any evidence or empirical data. See FCC v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S. Ct. 2096, 2098, 124 L. Ed. 2d 211 (1993). . . . Consequently, plaintiffs bear the heavy burden of "negativ[ing] every conceivable basis which might support [the legislation], . . . whether or not the basis has a foundation in the record." Heller, 509 U.S. at 320, 113 S. Ct. at 2643[, 125 L. Ed. 2d 257]. That being said, rational basis review is not a rubber stamp of all legislative action, as discrimination that can *only* be viewed as arbitrary and irrational *will* violate the Equal Protection Clause. See Vance v. Bradley, 440 U.S. 93, 97, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979) (stating that a law will fail rational basis review if "the

AO 72A
(Rev.8/82)

varying treatment of different groups of persons is so unrelated to
the achievement of any combination of legitimate purposes that
[the court] can only conclude that the [legislature's] actions were
irrational").

Hadix v. Johnson, 230 F.3d 840, 843 (6th Cir. 2000).

As the Eleventh Circuit has stated, the first step in the analysis is
identifying "a legitimate government purpose-a goal-which the enacting
government body *could* have been pursuing." Joel, 232 F.3d at 1358.
Defendant has identified three goals that the government could have been
pursuing in its decision to terminate Plaintiff: 1) avoiding lawsuits against the
government based on Plaintiff's restroom use; 2) avoiding disruption of the
operations of the OLC; and 3) maintaining the confidence of the state legislators
that the OLC serves.  (Def.'s Memo in Support of Motion for Summary
Judgment at 22).  The second step is to determine whether "a rational basis
exists for the enacting governmental body to believe that the legislation would
further the hypothesized purpose." Joel, 232 F.3d at 1358.

Concern over avoiding lawsuits arising from Plaintiff's use of multi-
person women's restrooms within the Capitol Building is a rational basis for
terminating her.  The record does not indicate that this was an actual concern-
and perhaps should not have been a concern given the presence of single-

46

occupancy restrooms in the OLC office-but in applying rational scrutiny, "[t]he government has no obligation to produce evidence to support the rationality of its statutory classifications and may rely entirely on rational speculation unsupported by any evidence or empirical data."  Hadix, 230 F.3d at 843. Plaintiff cites Cleburne as support for the argument that the costs of fending off baseless lawsuits cannot provide a rational basis for discrimination.  (Pl'.s Reply Brief in Support of Summary Judgment, Dkt. No. [65] at 10-11 (citing City of Cleburne, 473 U.S. at 449)).  However, Cleburne is distinguishable.  In that case, a Texas city denied a special use permit for the operation of a group home for the mentally retarded.  City of Cleburne, 473 U.S. at 435.  One of the government interests put forth by the city as a reason for denying the permit was the need to avoid legal responsibility for actions which the mentally retarded might take.  Id. at 449.  The Court stated that "[i]f there is no concern about legal responsibility with respect to other uses that would be permitted in the area, such as boarding and fraternity houses, it is difficult to believe that groups of mildly or moderately mentally retarded individuals . . . would present any different or special hazard."  Id. at 449.

The same cannot be said for the facts of this case.  An individual with male genitalia using a women's restroom does present a "different or special

hazard," and an increased litigation risk.  Such lawsuits could include claims for

invasion of privacy or sexual harassment.  (Def.'s Memo in Support of

Summary Judgment at 19).  Terminating an employee with male genitalia who

intends to present as a woman and thus could use women's restrooms would

further the purpose of avoiding lawsuits resulting from that use.  Avoiding the

costs of lawsuits, even meritless suits, is a rational legitimate government

interest.  Terminating an individual that could increase the prospects of such

suits is rationally related to the goal of avoiding such suits.  It cannot be said

that the termination "can *only* be viewed as arbitrary and irrational."  Hadix,

230 F.3d at 843 (citing Vance, 440 U.S. at 97).  Further, both the Tenth Circuit

and the Sixth Circuit have found that concerns resulting from a transsexual's

restroom use can be a legitimate, non-discriminatory basis for termination.  See

Etsitty, 502 F.3d at 1224 ("[Defendant] states it was concerned the use of

women's public restrooms by a biological male could result in liability for

[defendant].  This court agrees . . . that such a motivation constitutes a

legitimate, nondiscriminatory reason for [plaintiff's] termination under Title

VII."); Kastl, 325 Fed. Appx. at 494 (plaintiff could not present sufficient

evidence to show defendant was motivated by his gender and not the asserted

safety concerns resulting from his use of women's restrooms).  Having found

that Defendant's goal of avoiding lawsuits resulting from Plaintiff's bathroom use satisfies rational basis review, the Court need not address the validity of Defendants other two stated goals of avoiding disruptions in office work and preserving the confidence of legislators.

Defendant's termination of Plaintiff was rationally related to the furtherance of a legitimate government interest and thus satisfies rational basis review.  Defendant's Motion for Summary Judgment [46] as to Plaintiff's Second Claim for Relief is **GRANTED** and Plaintiff's Motion for Summary Judgment [37] as to that claim is **DENIED**.

## Conclusion

For the aforementioned reasons, Plaintiff's Motion for Dismissal [58] is **GRANTED**.  Defendants Richardson, Cagle, Johnson, and Underwood are **DISMISSED**, **with prejudice**, with those Defendants bearing their own costs. Defendants Richardson, Cagle, Johnson, and Underwood's Motion for Summary Judgment [45] is **DENIED**, **as moot**.  Plaintiff's Motion for Summary Judgment [37] is **GRANTED** as to the First Claim for Relief, and is **DENIED** as to the Second Claim for Relief.  Defendant's Motion for Summary Judgment [46] is **DENIED** as to the First Claim for Relief, and is **GRANTED** as to the Second Claim for Relief.

AO 72A
(Rev.8/82)

Having found that Defendant Brumby's decision to terminate Plaintiff violated her rights under the Equal Protection Clause, the Court must fashion an appropriate remedy.  The Court shall conduct a hearing on the remedy issue on Tuesday, July 13, 2010 at 1:30 p.m. in Courtroom 2105, United States Courthouse, 75 Spring Street, Atlanta, Georgia.  Prior to the hearing, the parties are encouraged to confer in an effort to agree upon an appropriate remedy in light of the Court's rulings herein.

SO ORDERED, this   2nd   day of July, 2010.


RICHARD W. STORY
United States District Judge

50